United States District Court
Southern District of Texas
**ENTERED**
January 27, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ZELMA M. LOEB-DEFEVER, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-1981 |
| | § | |
| STRATEGIC CONSTRUCTION, LTD. | § | |
| d/b/a FCI MULTI-FAMILY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This is a copyright infringement case brought by an architecture firm against a multitude of defendants that were involved in the development of a senior living facility called Woodhaven Village. In their live complaint, the plaintiffs—Zelma Loeb-Defever ("Loeb-Defever") and her company, Loeb Architects, LLC (collectively "Loeb")—have sued 24 defendants under 17 U.S.C. § 501 for copyright infringement and under 17 U.S.C. § 1202 for violation of the Digital Millennium Copyright Act ("DMCA"). (Dkt. 96 at pp. 1–11, 49–52). Loeb has also sued Defendant Padua Realty for breach of contract. (Dkt. 96 at pp. 52–53).

Six defendants have settled with Loeb.[1] (Dkt. 209). 17 of the remaining 18 defendants ("the moving defendants") have filed eight motions between them in which they seek summary judgment on all of Loeb's claims on various grounds. For the reasons outlined below, two of those motions for summary judgment (Dkt. 154 and Dkt. 156) are

---

[1] Those defendants are Strategic Construction, Ltd. d/b/a FCI Multi-Family; Partin Investments, LLC; W&P 1 Holdings, Inc.; Robert Partin; FCI Multi-Family GP, LLC; and FCI Multi-Family Holdings, LLC. (Dkt. 209).

**GRANTED**. One motion for summary judgment (Dkt. 157) is **DENIED IN PART AND DENIED AS MOOT IN PART**. Five other motions for summary judgment (Dkt. 151, Dkt. 152, Dkt. 153, Dkt. 155, and Dkt. 158) are **DENIED AS MOOT**.

Loeb's claims under 17 U.S.C. § 501 for copyright infringement and under 17 U.S.C. § 1202 for violation of the DMCA are **DISMISSED WITH PREJUDICE** as to the moving defendants. Loeb's claims against Defendant Ted Trout Architects, Ltd., which has not moved for summary judgment, survive. Loeb's breach of contract claim against Defendant Padua Realty also survives.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the development of a senior living facility in Conroe, Texas called Woodhaven Village. In 2011, Loeb and Padua Realty entered into two contracts whereby Loeb performed preliminary design work on two sections of Woodhaven Village in exchange for $10,800.00. (Dkt. 159-2; Dkt. 159-3). Prior to execution of the contracts, Loeb had sent Padua Realty a bid to handle all design work on Woodhaven Village for $232,000.00, but Padua Realty did not accept that bid. (Dkt. 159-4 at p. 66; Dkt. 162-20 at p. 2).

 The two sections of Woodhaven Village that were covered by the Loeb/Padua Realty contracts were: (1) an assisted living and memory care facility;[2] and (2) an independent living area with cottages. (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2). Each of the

---

[2] Loeb's complaint alleges that the contract for the assisted living and memory care facility was signed on October 29, 2010. (Dkt. 96 at p. 14). However, the dates on the contract in the summary judgment record relating to the assisted living and memory care facility indicate that the contract was signed by Loeb on October 7, 2010 and by Padua Realty on October 10, 2011. (Dkt. 159-2 at p. 6). The discrepancy has no effect on the Court's analysis.

two sections was the subject of a separate contract. (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2). The contracts were identical, except that one defined "[t]his project" with a description of the assisted living and memory care facility and the other defined "[t]his project" with a description of the independent living area and cottages. (Dkt. 159-2; Dkt. 159-3).

The contracts outlined seven phases of development for the two Woodhaven Village sections. (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2). The contracts specifically said that Padua Realty was only hiring Loeb for "Phases One and Two[,]" which the contracts defined as "Code Research, Site Diagnostics, Building Design Parameters, plus Schematic Building, Site Design, and with Exterior Elevation." (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2). Phases one and two, according to the contracts, comprised roughly 10% of the total design work on the projects. (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2).

Under each of the two contracts, Loeb ultimately promised to deliver to Padua Realty "[o]ne set of schematic site plan, floor plan, and exterior front elevation, drawn, colored/rendered and ready for [Padua Realty] to reproduce, scan, and/or dry mount and laminate as desired." (Dkt. 159-2 at p. 3; Dkt. 159-3 at p. 3). Each contract expressly provided that the documents created by Loeb could "not be used on other projects or extensions to this project except by agreement in writing and with appropriate indemnification and compensation to [Loeb]." (Dkt. 159-2 at p. 6; Dkt. 159-3 at p. 6). However, the contracts did not expressly require that Loeb agree to or be compensated for the use of its documents to complete design phases three through seven of the projects as defined in the contracts; and the contracts did not expressly require Padua Realty to

hire Loeb for design phases three through seven of the projects. (Dkt. 159-2 at p. 6; Dkt. 159-3 at p. 6).

It is clear from the contractual language and Loeb-Defever's deposition testimony that Loeb's being hired to handle phases one and two of the Woodhaven Village projects did not equate to Loeb's being hired to handle all design work on the projects. In her deposition, Loeb-Defever acknowledged that her company had no contractual agreement with Padua Realty to do any work beyond the creation of preliminary schematics:

> Q:   Okay. And you mentioned, earlier, that you did the schematics in this Case.
> I think you said so that the developer could show the schematics to investors and see what would fit on the property; is that right?
>
> A:   To see what fit on the property, to get the try to get the financing and it's first phase of the project—first and second phase of the project.
>
> Q:   Now, at the time that you provided the schematics, you did not have a contract to do any further work on the—on the project, did you?
>
> A:   Correct.
> Dkt. 159-4 at p. 66.

Loeb-Defever's deposition testimony also establishes that all seven project design phases listed in the contract were phases of the "same project" as contemplated by the contracts:

> Q:   . . . Let's look at the first page where—well, the first two pages, before you get to the compensation schedule of $5400 for Phases 1 and 2.
> You list out the phases there, correct?
>
> A:   Yes, I do.

> Q:     And you have typical project phases. Phase 1, code research. Phase 2, schematic building design. I'm just short handing. Phase 3, design development. Phase 4, construction documents. Phase 5, agency approvals, contractor bidding pricing. Phase 6, construction observation. Phase seven, project closeout.
>
> A:     Mm-hmm.
>
> Q:     . . . These are all phases of the same project, correct?
>
> A:     Yes.
> Dkt. 159-4 at pp. 79–80.

Loeb-Defever testified that it was common at the time for her company to be hired only for design phases one and two of a construction project:

> Q:     Right. I'm just lumping everybody into the universe of projects you've done. There's a better chance than not that you will not have any work to do on that after the second—after Phase 2, correct?
>
> A:     On some projects.
>
> Q:     On the majority of projects. Isn't that what you've just told me? On more than 50 percent of the projects?
>
> A:     During 2008, '09, '10, '11, '12 and '13, that would definitely be true.
> Dkt. 159-4 at pp. 76–77.

When Loeb delivered the schematics, Loeb and Padua Realty clearly contemplated the use of those schematics in subsequent design stages of the development of the Woodhaven Village projects. Loeb-Defever testified that a project generally cannot be built from schematics alone, and she acknowledged that the schematics that she provided to Padua Realty for the Woodhaven Village projects were not themselves permittable. (Dkt. 159-4 at p. 67). Loeb-Defever explained in her deposition that she considers

schematics to be "the foundation or springboard for the remaining portion of the design

construction documents" that comprise subsequent design phases:

> It's a first run at the design. It is the springboard or foundation in which the
> rest of the documents, design, engineering spawns off of. It's the beginning
> of the process.
> Dkt. 159-4 at pp. 22, 66.

Loeb-Defever conceded that she knew the schematics that she delivered to Padua

Realty would be used as just such a springboard for construction of the Woodhaven

Village projects:

> Q:   But you gave them schematics knowing they were going to use those
>      as a springboard on the property and to show to investors, correct?
>
> A:   Correct.
> Dkt. 159-4 at p. 66.

Loeb-Defever testified that her company provided the schematics as required by

the contracts in 2011. (Dkt. 159-4 at pp. 66, 71). When she delivered the schematics,

Loeb-Defever had not filed a copyright registration application for them. (Dkt. 159-4 at p.

72). Padua Realty paid Loeb the full $10,800.00 contract price for design phases one and

two of the Woodhaven Village projects. (Dkt. 159-2 at p. 3; Dkt. 159-3 at p. 3; Dkt. 159-

4 at p. 26). Padua Realty then hired a different architectural firm, Defendant Ted Trout

Architects, Ltd. ("Trout"), to handle the subsequent design work. (Dkt. 160-1 at p. 26;

Dkt. 162-10 at p. 11; Dkt. 162-20 at p. 2).

In 2013, Loeb-Defever learned from an acquaintance that Padua Realty had hired

Trout and that Trout had drawn up plans for the Woodhaven Village projects. (Dkt. 159-4

at pp. 55–57, 129–35). When the acquaintance sent Loeb-Defever a copy of the Trout

plans, Loeb-Defever compared the Trout plans to her own and concluded that her plans had provided a "starting point" for the Trout plans. (Dkt. 159-4 at pp. 55–57, 129–35, 137–39). Loeb-Defever then filed a copyright registration application for her Woodhaven Village schematics at "either the end of 2013 or beginning of 2014"—approximately two and a half years after she delivered the schematics to Padua Realty. (Dkt. 159-4 at p. 72). Loeb-Defever did not contact either Trout or Padua Realty to discuss the Woodhaven Village plans. (Dkt. 159-4 at p. 58).

In early 2014, Loeb-Defever began looking for an attorney:

> Q:   All right. And I don't—you don't need to pull this out. But a few months later, in early 2014, is when you write to Kathleen DeFever about your copy—quote, copyright dilemma, right?
>
> A:   Right. I started investigating if there was anything for me to worry about, anything that I can do. And that was the beginning of me looking for legal counsel—
>
> Q:   Okay.
>
> A:   Or if I even needed a legal counsel.
> Dkt. 159-4 at p. 85.

Loeb-Defever consulted with a law firm in January of 2017 and a second law firm at some point thereafter; neither firm agreed to represent Loeb. (Dkt. 159-4 at pp. 62–63, 146–47). Loeb filed this lawsuit on July 31, 2019. (Dkt. 1).

## II.   <u>SUMMARY JUDGMENTS</u>

All defendants except for Trout have moved for summary judgment under Federal Rule of Civil Procedure 56. In deciding a motion for summary judgment, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant's initial summary judgment burden depends on whether the movant will bear the burden of proof at trial. If the non-movant will bear the burden of proof at trial on an issue raised in a motion for summary judgment, then the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The movant need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The movant may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995). However, if the movant will carry the burden of proof at trial, as is the case when the movant is either the plaintiff or a defendant asserting an affirmative defense, then the movant can only carry its initial burden by establishing beyond peradventure all of the essential elements of its claim or defense. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

If the movant meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th

Cir. 2006) (citations omitted). In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from those facts must be reviewed in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

## III.   **IMPLIED LICENSE**

The moving defendants seek summary judgment on the affirmative defense of implied nonexclusive license. (Dkt. 154). Their argument is meritorious, and Loeb's claims under 17 U.S.C. § 501 for copyright infringement against those defendants must accordingly be dismissed.

### A.  *Legal standard*

To prevail on a copyright infringement claim, a plaintiff must show: (1) ownership of a valid copyright; and (2) unauthorized copying. *Peel & Co., Inc. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001). "But regardless of whether a plaintiff can meet these elements, the existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement." *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (quotation marks omitted). "Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract." *Geophysical Services, Inc. v. TGS-NOPEC Geophysical Services*, No. 14-1368, 2018 WL 3032575, at *5 (S.D. Tex. June 19, 2018) (J. Rosenthal), *aff'd*, 784 Fed. App'x 253 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 2802 (2020) (quotation marks omitted).

Although an exclusive license must be in writing, a nonexclusive license may be granted orally and may even be implied from "the totality of the parties' conduct[.]" *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872, 879 (5th Cir. 1997); *see also Baisden*, 693 F.3d at 500 ("Consent for an implied license may take the form of permission or lack of objection."). The Fifth Circuit has joined other circuits in holding that "an implied nonexclusive license arises when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Lulirama*, 128 F.3d at 879 (quotation marks omitted) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996) and *Effects Associates v. Cohen*, 908 F.2d 555, 558–59 (9th Cir. 1990)). The Fifth Circuit has also gone beyond the three-part *Lulirama* work-for-hire framework and has clarified that the existence of such a work-for-hire agreement, though sufficient to establish an implied nonexclusive license, is not necessary to establish one. *Baisden*, 693 F.3d at 501 ("To be sure, we applied those three elements in *Lulirama*. But we have never held that an implied license could not arise in other circumstances where the totality of the parties' conduct supported such an outcome.").

"Courts focus on objective evidence revealing the intent of the parties to determine if an implied license exists, and this inquiry also reveals the scope of that license." *Geophysical*, 2018 WL 3032575 at *12. "Thus, an implied license will be limited to a specific use only if that limitation is expressly conveyed when the work is delivered." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010); *see also*

*Geophysical Services, Inc. v. TGS-NOPEC Geophysical Company*, 784 Fed. App'x 253, 257 n.5 (5th Cir. 2019) (describing this holding from *Latimer* as "consistent with *Baisden*'s totality-of-the-circumstances inquiry").

### B. Analysis

The Court concludes as a matter of law that the totality of the parties' conduct establishes the existence of an implied nonexclusive license.

#### i.   The pertinent facts

The pertinent facts, which the Court has outlined earlier in this opinion, are undisputed, and many of them are established by Loeb-Defever's deposition testimony. Padua Realty hired Loeb to provide preliminary schematics for two sections of Woodhaven Village—a task amounting to roughly 10% of the total design work on those sections—in exchange for $10,800.00. (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2). Loeb had sent Padua Realty an earlier bid to handle all design work on Woodhaven Village for $232,000.00, but Padua Realty did not accept that bid—a clear indicator that Padua Realty would likely hire a different firm to handle the remainder of the design work. (Dkt. 159-4 at p. 66; Dkt. 162-20 at p. 2).

Padua Realty and Loeb signed a contract stipulating that Padua Realty could reproduce the schematics as desired, provided the schematics were not used on other projects or on extensions to the Woodhaven Village projects. (Dkt. 159-2 at pp. 3, 6; Dkt. 159-3 at pp. 3, 6). Loeb provided the schematics and received full payment for them. (Dkt. 159-4 at p. 26). Loeb did not tell Padua Realty that the schematics could only be used if Padua Realty hired Loeb to complete design phases three through seven of the

projects as defined in the contracts. (Dkt. 159-2 at pp. 3, 6; Dkt. 159-3 at pp. 3, 6). Loeb did not tell Padua Realty that the schematics could only be used to complete design phases three through seven of the projects if Loeb agreed to or was compensated for such use. (Dkt. 159-2 at pp. 3, 6; Dkt. 159-3 at pp. 3, 6). Loeb did not file a copyright registration application for her Woodhaven Village schematics until approximately two and a half years after she delivered the schematics to Padua Realty, when she learned that Padua Realty had hired Trout. (Dkt. 159-4 at p. 72).

In her deposition, Loeb-Defever acknowledged that Loeb had no contractual agreement to do any work beyond the creation of preliminary schematics and that her company was commonly hired to handle only preliminary design work on a project. (Dkt. 159-4 at pp. 66, 76–77). Loeb-Defever conceded that she knew the schematics she delivered to Padua Realty would be used as a springboard for the subsequent design and construction phases of the Woodhaven Village projects and that the schematics were not themselves permittable. (Dkt. 159-4 at pp. 66–67).

    ii.    *Shaver*

On this summary judgment record, the Court finds it impossible to meaningfully distinguish this case from the Seventh Circuit's *Shaver* opinion, which the Fifth Circuit has approvingly cited on several occasions. *See Lulirama*, 128 F.3d at 879; *Campbell v. Smythe*, 273 F.3d 1107, 2001 WL 1131783, at *1 (5th Cir. Sept. 11, 2001); *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 587 (5th Cir. 2015).

In *Shaver*, an architect, Shaver, contracted with two construction companies to prepare schematics for an air cargo and hangar building at an airport. *Shaver*, 74 F.3d at

770. The parties agreed that the schematics would be the first of four design phases, would provide "a reference base for further design development[,]" and would constitute 15–19% of the total design work for the building. *Id*. The parties' contract stated that the schematics were being created "for general reference" and "to permit the Project to proceed in a normal development manner." *Id*. (quotation marks omitted). The parties' contract neither required the construction companies to hire Shaver for subsequent design work on the building nor restricted the construction companies' ability to use the schematics for completion of the building. *Id*. at 770–71, 776. Shaver delivered a notice of copyright to the construction companies along with the schematics, but he did not indicate that he would sue the companies if they did not hire him to complete the design work on the building. *Id*. at 771. Nevertheless, when the construction companies hired another architect to complete the remaining design work, Shaver sued not only the construction companies but some of their executives, the second architect, and the owner of the airport. *Id*. at 771–72.

The Seventh Circuit affirmed summary judgment for all defendants against Shaver based on an implied nonexclusive license. *Id*. at 776–78. In its opinion, the *Shaver* court noted that the contract between Shaver and the construction companies mentioned "no expectation of a further role [for Shaver] in the Project [beyond drafting the schematics.]" *Id*. at 776. Consequently, "common sense" favored a finding of implied license because the construction companies' $10,000 payment to Shaver for the schematics obtained nothing of value if the schematics did not come with an implied license to use them. *Id*. at 777. Moreover, "Shaver delivered his copyrighted designs without any warning that their

further use would constitute copyright infringement." *Id*. Ultimately, Shaver's insistence that he expected to "be the architect who would be preparing the final drawings, presumably from his own preliminary drawings, to be used for the construction" lacked "any objective foundation[,]" and "the district court concluded correctly as a matter of law that Mr. Shaver granted an implied nonexclusive license to [the construction companies]." *Id.* at 776.

The Court will follow *Shaver* and will accordingly conclude that Loeb created an implied nonexclusive license to utilize its preliminary schematics in the completion of the Woodhaven Village projects. The Court further notes that the Fifth Circuit's *Hunn* opinion is also factually similar to this case and supports the same conclusion. *Hunn*, 789 F.3d at 587 (citing *Shaver* and holding that an architectural design firm created an implied nonexclusive license when it created custom home plans for a construction company and delivered those plans without restricting the construction company's ability to use the plans to build the houses) ("Contrary to [the architect's] assertion, several cases have found implied licenses in circumstances similar to those in this case."). Because Loeb received consideration—$10,800.00—for the preliminary schematics, the implied nonexclusive license to use those schematics was irrevocable. *Lulirama*, 128 F.3d at 882–83.

Additionally, even though Padua Realty hired Loeb to create the schematics, the implied license granted by Loeb shields from liability all of the moving defendants, not just Padua Realty. As in *Shaver*, the involvement of third parties in the development of Woodhaven Village was consistent with the scope of the license and did not constitute an

impermissible transfer of the rights contained in the license—Loeb-Defever herself testified that her company had no contractual agreement to do any work beyond the creation of preliminary schematics and that she knew the schematics she delivered to Padua Realty would be used by Padua Realty as a springboard for the subsequent design and construction phases of the Woodhaven Village projects. *Cf. Shaver*, 74 F.3d at 777–78 (affirming summary judgment for all defendants on the basis of implied license and rejecting Shaver's argument that allowing another architect to use his schematics exceeded the scope of any implied license); *see also Womack+Hampton Architects, L.L.C. v. Metric Holdings Ltd. Partnership*, 102 Fed. App'x 374, 382–83 (5th Cir. 2004) (holding that a developer's hiring of architects was consistent with the scope of the license granted by an earlier architect and was not an impermissible transfer of the rights granted in the license); *Hogan Systems, Inc. v. Cybresource International, Inc.*, 158 F.3d 319, 323 (5th Cir. 1998) (holding that a bank's use of independent contractors to work on licensed software was not an impermissible transfer of a license to those contractors because "all of the work being done inure[d] to the benefit" of the bank).

### iii.   The written contracts do not bar a finding of implied license.

Loeb argues that a finding of implied license is forestalled here "under both federal Copyright law and Texas contract law" because Loeb and Padua Realty executed written contracts. (Dkt. 181 at pp. 17–18). The Court disagrees.

As a blanket statement of federal copyright law, Loeb's assertion is simply incorrect. *Shaver* and *Hunn*, for example, both involved parties that had executed written contracts. *Shaver*, 74 F.3d at 777; *Hunn*, 789 F.3d at 578. When courts have held that a

written contract barred a finding of an implied license in an architectural copyright case, they have cited the *language* of the written contract, not its mere existence; such cases often involve a form contract promulgated by the American Institute of Architects ("AIA") that expressly prohibits the use of an architect's drawings to complete a project for which the architect contributes design work unless the architect either gives explicit written consent or is retained to complete all design work on the project. *See, e.g., John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.,* 322 F.3d 26, 41 (1st Cir. 2003) (architect and client signed standard AIA contract providing that the plans "shall not be used . . . for other projects, for additions to this Project, or *for completion of this Project by others* . . . except by agreement in writing and with appropriate compensation") (emphasis added); *Nelson–Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505, 516 (4th Cir. 2002) (plaintiff architectural firm submitted contracts to client that "contained the standard AIA prohibition against use of the [plaintiff's] Drawings without [the plaintiff's] future involvement or its express consent"); *Johnson v. Jones,* 149 F.3d 494, 498–500 (6th Cir. 1998) (architect submitted two AIA contracts to client that expressly provided that the architect's "drawings would not be used *for completion of the Jones house by others*, except by written agreement with appropriate compensation") (emphasis added). Unlike the form AIA contract, the contracts between Loeb and Padua Realty did not expressly require that Loeb agree to or be compensated for the use of its documents to complete design phases three through seven of the projects as defined in the contracts; and the contracts did not expressly require Padua Realty to hire Loeb for design phases three through seven of the projects.

The Court also disagrees with Loeb's assertion that Texas contract law bars a finding of implied license on this record. Loeb contends that state law governs the formation of implied licenses in copyright cases and that "quasi-contractual claims" are unavailable under Texas law when a valid, express contract exists that governs the subject matter of the dispute. (Dkt. 181 at pp. 17–18). But Loeb's choice-of-law contention is questionable: commentators have noted that it is unclear whether state law or federal common law controls the formation of implied licenses in copyright cases. *See* Christopher M. Newman, *What Exactly Are You Implying: The Elusive Nature of the Implied Copyright License*, 32 CARDOZO ARTS & ENT. L.J. 501 (2014) ("[I]t is clear that much of this doctrine has been developed as a form of federal common law."). And the recent *Geophysical* litigation, which originated in this District, cuts strongly against Loeb's position.

In *Geophysical*, Judge Rosenthal concluded that the plaintiff had granted a written express license and, in the alternative, an implied license. *See Geophysical*, 2018 WL 3032575, at *12 ("Even if Geophysical did not give the Board an express license, the objective evidence that TGS has provided regarding its express license argument shows that Geophysical should have known that by submitting an offshore program notice and participating in the seismic data submission regime, it was impliedly granting a license to the Board to copy and distribute the seismic data."). Judge Rosenthal cited Texas caselaw for contract formation principles when discussing express licenses and cited *Baisden* and *Lulirama* when discussing implied licenses. *Id*. at *5. Notably, the Fifth Circuit affirmed Judge Rosenthal's judgment on the implied license issue, citing only *Baisden* and

*Lulirama*, and saw no need to reach the question of whether an express license existed. *Geophysical Services, Inc. v. TGS-NOPEC Geophysical Company*, 784 Fed. App'x 253, 254, 256 (5th Cir. 2019). The Supreme Court denied certiorari. *Geophysical Services, Inc. v. TGS-NOPEC Geophysical Company*, 140 S. Ct. 2802 (2020).

In light of *Geophysical*, the Court is not persuaded by Loeb's argument that a finding of implied license is barred because Loeb and Padua Realty executed written contracts. Again, unlike the form AIA contract discussed in the cases cited above, the contracts between Loeb and Padua Realty did not expressly require that Loeb agree to or be compensated for the use of its documents to complete design phases three through seven of the projects as defined in the contracts; and the contracts did not expressly require Padua Realty to hire Loeb for design phases three through seven of the projects. The totality of the parties' conduct, including the language of the contracts themselves, establishes the existence of an implied nonexclusive license.

## IV.   <u>EXPRESS LICENSE</u>

In any event, having reviewed the parties' arguments and the applicable law, the Court agrees with the moving defendants' contention that Loeb, in the alternative, granted an express nonexclusive license to utilize its preliminary schematics in the completion of the Woodhaven Village projects.

### A.  *Legal standard*

In their papers, the parties apply Texas contract law to the question of whether Loeb granted an express nonexclusive license in the contracts that it signed with Padua

Realty. (Dkt. 154 at p. 16; Dkt. 181 at p. 13). The Court will, as well. *See Geophysical*, 2018 WL 3032575, at *5.

Under Texas law, "[a] written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.,* 352 S.W.3d 462, 469 (Tex. 2011). "Facts and circumstances that may be considered include the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give context to the parties' transaction." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22–24 (Tex. 2014) (considering arbitration practices that were common and American Arbitration Association rules that were in place at the time an arbitration agreement was executed to determine whether the parties intended for the word "independent" in their arbitration agreement to mean "impartial"). The parol evidence rule precludes considering evidence that would render a contract ambiguous when the document is capable of a definite legal meaning on its face; but the parol evidence rule does not prohibit considering surrounding facts and circumstances that inform the contract text and render it capable of only one meaning. *Id*. at 22.

Unambiguous contracts are construed as a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "A contract is not ambiguous merely because the parties have a disagreement on the correct interpretation." *REO Industries, Inc. v. Natural Gas Pipeline Co. of America*, 932 F.2d 447, 453 (5th Cir. 1991). Courts applying Texas law "construe contracts from a utilitarian standpoint bearing in mind the particular business

activity sought to be served and will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost National Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310, 312–13 (Tex. 2005) (quotation marks omitted) (holding that a lessee's interpretation of a lease was unreasonable when that interpretation would have given the lessee the power to force the lessor to sell the leased equipment for twenty percent of its original invoice price at any point during a five-year lease, instead of only at the end of the lease) ("At the lessee's discretion, then, the lessor would essentially have to forgo almost the entire rental value of the equipment and sell it almost new for twenty percent of its value, the same price it would receive for selling the equipment at the end of the lease term after collecting rent on it for sixty months."). !

### B.   Analysis

The Court concludes that Loeb granted an express nonexclusive license in the contracts that it signed with Padua Realty to utilize its preliminary schematics in the completion of the Woodhaven Village projects. Padua Realty and Loeb signed contracts plainly stipulating that Padua Realty could "reproduce" Loeb's schematics "as desired[,]" provided the schematics were not used on other projects or on extensions to the Woodhaven Village projects. (Dkt. 159-2 at pp. 3, 6; Dkt. 159-3 at pp. 3, 6). Each contract thoroughly defines the project to which it refers, and each contract outlines seven developmental phases and specifies that Loeb was only hired to perform phases one and two. (Dkt. 159-2 at p. 2; Dkt. 159-3 at p. 2). Although the contracts bar use of the schematics to complete "extensions to this project[,]" the contractual definitions make clear that "extensions to this project" does not include design phases three through seven

of the projects. (Dkt. 159-2 at pp. 2, 6; Dkt. 159-3 at pp. 2, 6). The text of the contracts clearly allowed Padua Realty to use Loeb's schematics to complete the defined projects.

The facts and circumstances surrounding the contracts' execution further inform the contractual language and render it capable of only one meaning: Loeb granted an express nonexclusive license to use the schematics for phases three through seven of the Woodhaven Village projects. This sort of license was obviously common when the Loeb/Padua Realty contracts were signed, as the AIA had recently promulgated a "Standard Form of Agreement Between Owner and Architect" that specifically created such a license irrespective of whether the architect was still retained when the owner used the architect's work. *See* AIA Document B101—2007, Article 7, accessed at https://www.clemson.edu/giving/cufoundations/structure/culsf/documents/AIA%20Docu ment%20B101.pdf. Moreover, Loeb put in an unsuccessful bid to handle all seven design phases of the Woodhaven Village projects, and Loeb-Defever confirmed that her firm was commonly hired to handle only preliminary design work on a project. (Dkt. 159-4 at pp. 66, 76–77; Dkt. 162-20 at p. 2). Loeb-Defever further confirmed that all seven project design phases listed in the contract were phases of the "same project" as contemplated by the contracts. (Dkt. 159-4 at pp. 79–80). Loeb-Defever conceded that she knew the schematics she delivered to Padua Realty would be used as a springboard for the subsequent design and construction phases of the Woodhaven Village projects and that the schematics were not themselves permittable. (Dkt. 159-4 at pp. 22, 66–67). Loeb-Defever further explained that schematics are typically used as such a springboard on a project. (Dkt. 159-4 at pp. 22, 66). Absent a nonexclusive license to use the schematics,

schematics could only serve as a springboard for further design and construction if the architect who created the schematics either was retained to handle all phases of the project or was effectively given veto power over the project. Neither the language in the Loeb/Padua Realty contracts nor the circumstances surrounding the contracts' execution demands such an interpretation, and construing the contracts in that manner is unreasonable.

The Court concludes that Loeb granted an express nonexclusive license to utilize its preliminary schematics in the completion of the Woodhaven Village projects. The express license was supported by consideration and accordingly was irrevocable. *Lulirama*, 128 F.3d at 882–83. Furthermore, the express license extended to all of the moving defendants. *See Shaver*, 74 F.3d at 777–78; *Womack+Hampton Architects*, 102 Fed. App'x at 382–83; *Hogan Systems*, 158 F.3d at 323.

## V.   **THE DMCA**

Loeb has also brought claims under 17 U.S.C. § 1202 for violation of the DMCA. The Court will grant summary judgment on those claims. Even if the DMCA applies to derivative works, the summary judgment record contains no evidence establishing scienter.

### A.  *The statute and Loeb's contentions*

The DMCA protects a copyright owner from another's knowing and intentional misuse of copyright management information ("CMI") to induce, enable, facilitate, or conceal infringement. *See* 17 U.S.C. § 1202. Among other things, CMI includes: (1) the title and other information identifying the work, including the information set forth on a

notice of copyright; (2) the name of, and other identifying information about, the author of a work; and (3) the name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright. 17 U.S.C. § 1202(c).

Section 1202(a) of the DMCA prohibits a person from knowingly providing, distributing, or importing for distribution false CMI with the intent to induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1202(a). A plaintiff suing under Section 1202(a) must show that the defendant "knowingly provided false copyright information *and* that the defendant did so with the intent to induce, enable, facilitate, or conceal an infringement." *Krechmer v. Tantaros*, 747 Fed. App'x 6, 9 (2d Cir. 2018). This conjunctive language has been referred to as a "double scienter" requirement. *Id*.

Section 1202(b), which features three disjunctive subparts, contains a similar double-scienter requirement. *See Mango v. Buzzfeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020). Section 1202(b)(1) prohibits a person from intentionally removing or altering any CMI without permission from the copyright owner. 17 U.S.C. § 1202(b)(1). Section 1202(b)(2) prohibits distributing or importing for distribution CMI while knowing that the CMI has been removed or altered without authority of the copyright owner or the law. 17 U.S.C. § 1202(b)(2). Section 1202(b)(3) prohibits distributing or importing for distribution works, copies of works, or phonorecords while knowing that CMI has been removed or altered without authority of the copyright owner or the law. 17 U.S.C. § 1202(b)(3). All three subsections of Section 1202(b) "require the defendant to possess the mental state of knowing, or having a reasonable basis to know, that his actions will

induce, enable, facilitate, or conceal infringement." *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018); *see also* 17 U.S.C. § 1202(b). In other words, Section 1202(b) requires an affirmative showing not only that the defendant committed the prohibited act but that the defendant knew or had a reasonable basis to know that the prohibited act would induce, enable, facilitate, or conceal infringement under federal copyright law. *Mango*, 970 F.3d at 171; *Stevens*, 899 F.3d at 673; *see also* 17 U.S.C. § 1202(b).

Loeb contends that Trout violated the DMCA because "Trout put its own copyright notice and its own name on the construction documents it prepared from [Loeb's] schematic design." (Dkt. 183 at pp. 8–12). Loeb contends that Defendant Texas Senior Living Operator, LLC violated the DMCA "by distributing advertising materials including copies or derivatives of [Loeb's] unit and cottage floor plan designs from which [Loeb's] CMI had been removed." (Dkt. 183 at pp. 12–13). Loeb contends that the other defendants are secondarily liable. (Dkt. 183 at pp. 23–30).

B. *Analysis*

The Court disagrees with Loeb for two reasons. First, well-reasoned persuasive authority holds that the DMCA does not apply to derivative works. Second, the existence of a nonexclusive license, coupled with the other evidence in the record, conclusively negates the element of scienter.

i.   Derivative works

Loeb contends that, after Padua Realty hired Trout, Trout received Loeb's schematic designs from Padua Realty and used the schematic designs as a starting point to produce construction documents of its own, which Trout then labeled with Trout's

CMI but not Loeb's. (Dkt. 183 at pp. 9–10). All of the defendants' alleged DMCA liability stems from the fact that Trout did not include Loeb's CMI on Trout's construction documents.

The moving defendants argue that a defendant cannot be sued under the DMCA for failing to include a plaintiff's CMI on an allegedly derivative product generated by the defendant, such as Trout's drawings. (Dkt. 156 at pp. 17–19). Although there is no binding authority on the question, several district court opinions support the moving defendants' position, and the reasoning of those courts is persuasive when applied to this summary judgment record. *See Frost-Tsuji Architects v. Highway Inn, Inc.*, No. 13-00496, 2014 WL 5798282, at *7 (D. Hawai'i Nov. 7, 2014), *aff'd*, 700 Fed. App'x 674 (9th Cir. 2017) ("To the extent Frost–Tsuji is arguing that Kadowaki created 'shop drawings' based on Frost–Tsuji's work and left out Frost–Tsuji's [CMI] in the process, no actionable removal of [CMI] is involved, as basing a drawing on another's work is not the same as removing [CMI]."); *Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17-C-7432, 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019) ("Plaintiffs do not allege WK Olson directly reproduced their plans without CMI. Instead, they contend that WK Olson copied aspects of its original works, with WK Olson's plans appearing 'virtually identical' to those of Plaintiffs. . . . Therefore, Plaintiffs have not alleged a DMCA violation[.]"); *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1359–60 (N.D. Fla. 2010) ("No alteration was made to Dr. Moulton's product or original work, so there was no violation of the DMCA[.]"); *see also RAZ Imports, Inc. v. Regency International Business Corp.*, No. 3:19-CV-1855, 2020 WL 4500627, at *3–5 (N.D. Tex.

Aug. 5, 2020) (collecting cases). The Court concludes that Loeb cannot base a DMCA suit on Trout's drawings.

      ii.    <u>Scienter</u>

Even if the DMCA reaches derivative works such as Trout's drawings, there is no evidence in the record establishing that any of the moving defendants acted with the required state of mind. A plaintiff suing under Section 1202(a) must show that the defendant acted with the intent to induce, enable, facilitate, or conceal an infringement; and a plaintiff suing under Section 1202(b) must show that the defendant knew or had a reasonable basis to know that the prohibited act would induce, enable, facilitate, or conceal infringement under federal copyright law.

There is no evidence in the record showing that any moving defendant engaged in DMCA-prohibited conduct knowingly, let alone intentionally. To the contrary, the Court has held that Padua Realty had a nonexclusive license to use Loeb's preliminary schematics. Padua Realty and the other defendants utilized Loeb's schematics in the development of the Woodhaven Village projects within the scope of that nonexclusive license. So, even if one or more of the defendants removed Loeb's CMI, "no Defendant can be said to have removed any copyright management information knowing or having reasonable grounds to know that the removal would induce, enable, facilitate, or conceal an infringement of the federal copyright laws." *Frost-Tsuji*, 2014 WL 5798282 at *8 (quotation marks and brackets omitted).

Loeb created preliminary schematics at Padua Realty's request and delivered those schematics to Padua Realty intending that Padua Realty use them as a springboard for the

subsequent design and construction phases of the Woodhaven Village projects. (Dkt. 159-4 at pp. 66–67). Moreover, Loeb did not file a copyright registration application for her Woodhaven Village schematics until approximately two and a half years after she delivered the schematics to Padua Realty, when she learned that Padua Realty had hired Trout. (Dkt. 159-4 at p. 72). Even after she filed her copyright registration application, Loeb-Defever did not contact either Trout or Padua Realty to discuss the Woodhaven Village plans. (Dkt. 159-4 at p. 58). There is no evidence that Loeb contacted any defendant regarding potential DMCA violations until this lawsuit was filed.

The evidence in the summary judgment record conclusively negates the scienter element of Loeb's DMCA claims.

## VI.    BREACH OF CONTRACT

Loeb has sued Padua Realty for breach of contract. (Dkt. 96 at pp. 52–53). Padua Realty has moved for summary judgment on Loeb's contract claims on the basis that the claims were brought outside of the statute of limitations. (Dkt. 157 at pp. 25–28). Although it is a close call, on this record the Court will deny Padua Realty's motion.[3]

Breach of contract claims under Texas law are subject to a four-year statute of limitations. *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). A breach of contract claim accrues when the contract is breached. *Id.*

---

[3] In the same motion, several of the moving defendants seek summary judgment on Loeb's copyright infringement claims for various reasons. (Dkt. 157 at pp. 6–25). Since the Court is dismissing all copyright infringement claims against the moving defendants on the basis of nonexclusive license, the remainder of docket entry 157 is **DENIED AS MOOT**.

Loeb pleads that Padua Realty breached four separate provisions of the Loeb/Padua Realty contracts. Specifically, Loeb alleges that Padua Realty:

> (1) did not "Furnish" to Loeb Architects "and coordinate services of those Consultants," in particular, Trout, "not included in the Scope of Services";
>
> (2) did not "Acknowledge the professional services provided by the Architect (e.g., publications, renderings, and other news releases)";
>
> (3) did not "consult with Architect prior to release of advertising/document for required copyright and legal verbiage notations"; and
>
> (4) did not "inform Architect of all information known to Owner about the site or building that otherwise may affect either the Architect's performance of their contractual obligations."
>
> Dkt. 96 at pp. 48–49.

Loeb filed this lawsuit on July 31, 2019. (Dkt. 1). Padua Realty argues that all of Loeb's breach of contract claims necessarily accrued outside of the four-year limitations period because Loeb "received a copy of Trout's plans in 2013" and Loeb-Defever "began contacting attorneys as early as 2014 regarding her view that [Trout] had copied her drawings for use in the remaining phases of architectural design" of the Woodhaven Village projects. (Dkt. 157 at p. 28). Padua Realty's argument has considerable force, but that argument alone does not establish "beyond peradventure" that all of Loeb's breach of contract claims are barred by limitations; and it accordingly does not entitle Padua Realty to summary judgment. *Fontenot*, 780 F.2d at 1194.

## VII.   <u>CONCLUSION</u>

For the reasons outlined above, docket entries 154 and 156 are **GRANTED**. Docket entry 157 is **DENIED IN PART AND DENIED AS MOOT IN PART**. Docket entries 151, 152, 153, 155, and 158 are **DENIED AS MOOT**.

Plaintiffs' claims under 17 U.S.C. § 501 for copyright infringement and under 17 U.S.C. § 1202 for violation of the DMCA are **DISMISSED WITH PREJUDICE** as to all defendants except Defendant Ted Trout Architects, Ltd. Plaintiffs' claims against Defendant Ted Trout Architects, Ltd., which has not moved for summary judgment, survive. Plaintiffs' breach of contract claim against Defendant Padua Realty also survives.

SIGNED at Houston, Texas, on January 27, 2022.


George C. Hanks, Jr
United States District Judge